## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| SEVEN NETWORKS, LLC, | |
| Plaintiff, | CIVIL ACTION NO. 2:17-CV-442-JRG LEAD CASE |
| v. | PATENT CASE |
| GOOGLE LLC, | JURY TRIAL DEMANDED |
| Defendant. | |
| v. | |
| SAMSUNG ELECTRONICS AMERICA, INC. AND SAMSUNG ELECTRONICS CO., LTD., | CIVIL ACTION NO. 2:17-CV-441-JRG CONSOLIDATED CASE |
| Defendants. | |

## SEVEN'S MOTION TO COMPEL GOOGLE TO PRODUCE OUTSTANDING DISCOVERY

# Introduction

SEVEN moves to compel Google to produce the following outstanding categories of discovery: (i) a complete response to Interrogatory No. 2, which seeks basic sales, revenue, cost, and profit information regarding Google's Accused Mobile Products, and (ii) multiple categories of documents regarding data and studies Google keeps regarding the extent of use of the Accused Products. This discovery has been outstanding for months, and in some cases, close to one year. It is relevant, and is not objectionable. SEVEN therefore asks the Court to compel its production.

# Arguments and Authorities

## A. Legal standard

The Federal Rules of Civil Procedure provide for broad discovery—parties are entitled to discover any non-privileged matter relevant to any party's claim or defense in proportion to the case's needs. *See* Fed. R. Civ. P. 26(b)(1). To that end, when a party fails to answer a discovery request, the requesting party may move to compel an answer. *See* Fed. R. Civ. P. 37(a)(3). "An evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

The burden is on "[t]he party resisting discovery"—here, Google—"[to] show specifically how each discovery request is not relevant or [is] otherwise objectionable." *See McKinney/Pearl Rest. Partners, L.P. v. Metropolitan Life Ins. Co.*, No. 3:14-cv-2498-B, 2016 WL 2997744, at *4 (N.D. Tex. May 25, 2016) (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)). Here, Google cannot.

## B. Google must provide a complete and accurate response to Interrogatory No. 2.

Interrogatory No. 2—which SEVEN served on October 17, 2017—asks simply for sales information for each Accused Mobile Product (i.e., Google's nine models of Nexus and Pixel

– 1 –

mobile devices) by month, quarter, and year, including units, prices, revenues, costs, and profits

for each. Google has served five versions of responses over the course of the last ten months. But

Google still has not answered this basic Interrogatory, failing to provide revenues or costs for the

Accused Products on a product level for any time period. In fact, Google's corporate

representative testified that Google has not produced data from which Google's revenues, costs

of goods sold, and gross profit can be determined for each Accused Product.[1] Google contends

that it does not maintain revenue and cost information at the device level in the ordinary course

of business. But Yuki Richardson, Google's 30(b)(6) witness designated on financial topics,

testified that this information exists, although it likely is tracked in multiple databases:

> Q. Can you tell me what data Alphabet maintains with respect to the sales of its
> hardware? And by that I mean, whether it tracks purchase orders, quantity, price,
> the name of the customer or carrier, the cost -- the costs associated with building
> the hardware or anything else that might be in that database.
>
> A: So -- well, I'm in finance, so I can tell you that we do have systems that tell us
> about the financials associated with the hardware. When it comes to specific, more
> detailed metrics, I'm less sure whether there is one system that could generate all
> this information.
>
> Q. Do you know whether there is more than one system that the data would be
> spread across?
>
> A: It's very likely, but I'm not sure.[2]

It appears that information about the device-level sales, revenue, and costs comes from

different systems, namely the financial system and a sales system. While Google has the

information necessary to answer the Interrogatory, it has thus far refused on the basis that the

requested information (device-level sales, revenue, and costs) is not kept in one system where a

---

[1] *See* **Ex. A**: Deposition of Yuki Richardson ("Richardson Dep.") at 152:5–12.

[2] *See* **Ex. A**: Richardson Dep. at 56:24–57:18.

███████████████████████████████

simple report can be run. But there is no question that Google (i) has the information to answer

this Interrogatory; (ii) has the ability to put the information together; and (iii) is far better

equipped than SEVEN to answer the Interrogatory. This financial information is directly relevant

to SEVEN's damages calculations since it deals with device-level quantity, revenue, and profits,

and it is important to the formulation SEVEN's expert report on damages. The damages experts

should not have a dispute over basic information about Google's device-level sales revenues and

profits. Google is uniquely positioned to provide an answer to Interrogatory No. 2. It therefore

must provide a full response.

**C.  Google must produce the relevant, unobjectionable documents SEVEN seeks.**

Google has not produced numerous categories of documents that are generally responsive

to SEVEN's September 2017 and July 20, 2018 document-request letters. They are as follows:[3]

**1.  Documents related to collection of user data responsive to at least Request Nos. 98, 105, 150, and 172.**

Google's 30(b)(6) witness, Alistair Pott, testified that ████████████████████

These ████████ are relevant to SEVEN's damages case. Specifically, SEVEN's patents

---

[3]  Google objects that the specific categories of documents SEVEN seeks to compel were not contained in SEVEN's prior requests for production. But the documents SEVEN seeks fall generally within the identified requests. And through the discovery process—including Alistair Pott's identification of various data and studies Google maintains, discussed below—SEVEN has been able to refine the description of the information necessary for its damages analysis. Further, the documents SEVEN seeks are also encompassed by requests made in a July 20, 2018 letter from Justin Cohen (SEVEN) to Charlie Verhoeven (Google). But regardless, these specific requests were made during the discovery period, and are directed to relevant information within Google's possession. And it was Google's burden to produce all documents relevant to any party's claims or defenses, *without awaiting a request*. *See* ECF No. 106 ¶ 3 & n.1 ("Without awaiting a discovery request, each party will make . . . disclosures to every other party. . . . The Court anticipates that this disclosure requirement will obviate the need for requests for production.").

[4]  *See, e.g.*, **Ex. B**: Deposition of Alistair Pott ("Pott Dep.") ROUGH at 51:9–18.

– 3 –

███████████████████████████████████

extend battery life, which allows for longer device usage and, consequently, more downloads. This information is relevant to Google's direct infringement as well as to Google's indirect infringement. For example, Google provides the Android operating system, which includes the accused battering-saving technology. Google derives advertising revenue through Android-based mobile devices, and sales of digital content through the Google Play Store. The more time that Android users are able to interact with their devices, the more revenue Google is capable of generating. Google studies ████████████████████████████████

████████████████████████████████████████

   To that end, SEVEN seeks: (i) ███████████ including, but not limited to those described by Alistair Pott; (ii) documents sufficient to show the average number of active hours an average or typical user spends on his or her mobile device per day; and (iii) documents sufficient to show the average number of downloads from the Google Play store made by an average or typical user on his or her mobile device per day. Mr. Pott provided ████████████████████████

████████████████████████—SEVEN seeks additional similar reports showing Google Play usage and downloads ██████████, which are responsive to at least requests 98, 105, 150, and 172.[5]

## 2. Documents related to the value, advantages, and benefits of the Accused Products, responsive to at least Request Nos. 42, 60, 76, 118, 148, 177, and 178.

   With the above-listed Requests, SEVEN seeks documents reflecting the Accused Products' added value, which, again, is relevant to its damages case. Here again, SEVEN will use this information to show that longer battery life—which its patents provide—results in more usage,

---

   [5]   Google claims it has produced responsive documents, but the documents to which it directed SEVEN were unrelated to these requests.

as described above. To that end, SEVEN seeks from Google: documents sufficient to show the effect of extended battery life with respect to: (i) the average number of active hours an average or typical user spends on his or her mobile device per day, and (ii) the average number of downloads from the Google Play store made by an average or typical user on his or her mobile device per day.[6]

**3. Documents sufficient to show Google's pricing model and policy for mobile advertising (e.g., the pricing structure and model for advertisements through Google Play, Google search through Android, and YouTube Mobile advertising).**

Finally, SEVEN seeks Google's pricing model and policy for mobile advertising. Again, because longer mobile phone use—accomplished by SEVEN's battery-savings patents—results in higher revenues to Google, Google's model and policy for pricing advertising is relevant to SEVEN's damages case. In particular, Google's advertising pricing models through Android (e.g., Google Play Store, YouTube Mobile, and Google search through Android) will show that Google derives additional revenue based on the number of views or impressions by users. Naturally, the longer users are able to interact with their devices, the more ads Google can serve, and the more ad impressions Google can sell. While Google's publicly available information shows this information generally, Google has refused to provide its basic internal pricing models that would show the advertising pricing based on users served and number of impressions.

Google will not even agree to look for this information. Instead, it points SEVEN to websites that provide general information and contact telephone numbers for additional details. These are completely irrelevant. Google is obligated to produce the information SEVEN seeks.

---

[6] Google has committed to search for these documents. If Google produces responsive documents, SEVEN will withdraw this Request.

████████████████████████████████████

## Conclusion

Google has no basis for withholding the discovery SEVEN seeks in this Motion.

Accordingly, SEVEN asks the Court to compel Google to produce it.

███████████████████████████

Dated: September 4, 2018

Respectfully submitted,

/s/ Justin S. Cohen
**Bruce S. Sostek**
  State Bar No. 18855700
  Bruce.Sostek@tklaw.com
**Max Ciccarelli**
  State Bar No. 00787242
  Max.Ciccarelli@tklaw.com
**Herbert J. Hammond**
  State Bar No. 08858500
  Herbert.Hammond@tklaw.com
**Richard L. Wynne Jr.**
  State Bar No. 24003214
  Richard.Wynne@tklaw.com
**J. Michael Heinlen**
  State Bar No. 24032287
  Michael.Heinlen@tklaw.com
**Adrienne E. Dominguez**
  State Bar No. 00793630
  Adrienne.Dominguez@tklaw.com
**Justin Cohen**
  State Bar No. 24078356
  Justin.Cohen@tklaw.com
**Vishal Patel**
  State Bar No. 24065885
  Vishal.Patel@tklaw.com
**Nadia E. Haghighatian**
  State Bar No. 24087652
  Nadia.Haghighatian@tklaw.com
**Austin Teng**
  State Bar No. 24093247
  Austin.Teng@tklaw.com
**Natalie M. Cooley**
  State Bar No. 24079912
  Natalie.Cooley@tklaw.com
**Matthew Cornelia**
  State Bar No. 24097534
  Matt.Cornelia@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, Texas 75201
214.969.1700
214.969.1751 (Fax)

**Samuel F. Baxter**
  Texas State Bar No. 01938000
  sbaxter@mckoolsmith.com

**MCKOOL SMITH, P.C.**
104 E. Houston Street, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

**Theodore Stevenson, III**
  Texas State Bar No. 19196650
  tstevenson@mckoolsmith.com
**Eric S. Hansen**
  Texas State Bar No. 24062763
  ehansen@mckoolsmith.com

**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

**ATTORNEYS FOR PLAINTIFF
SEVEN NETWORKS LLC**

████████████████████████████████████

### CERTIFICATE OF SERVICE

I certify that on September 4, 2018, a true and correct copy of the foregoing document was served on all counsel of record via ECF.

*/s/ Justin Cohen*
Justin Cohen

### CERTIFICATE OF CONFERENCE

I certify that on August 31, 2018, I and Sam Baxter (SEVEN) conferred via telephone with Charlie Verhoeven and Mike Jones (Google) in compliance with L.R. CV-7(h). On that phone call, the Parties addressed the issues in this Motion (among others), and agreed to move to extend the motion-to-compel deadline from August 31 to September 4 in efforts to avoid burdening the Court. On August 31, Justin Cohen (SEVEN) and Andrea Roberts (Google) had another call to discuss additional details of these discovery disputes. Unfortunately, the Parties still were unable to resolve the issues in this Motion, and have reached an impasse regarding the relief sought. Court assistance is therefore necessary. Google opposes this Motion.

*/s/ Max Ciccarelli*
Max Ciccarelli

*/s/ Samuel F. Baxter*
Samuel F. Baxter

### CERTIFICATE OF AUTHORITY TO FILE UNDER SEAL

I certify that I have authority to file this document under seal under this Court's Local Rules and the Protective Order in this case.

*/s/ Justin Cohen*
Justin Cohen

# EXHIBIT A

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Page 54

1    MS. BAILY:  You can answer yes or no.
2    THE WITNESS:  Yes.
3  BY MS. DOMINGUEZ:
4    Q.  Does Alphabet generate P&L statements with
5  respect to revenues generated by the sales of
6  hardware, including smartphones and tablets?
7    A.  Sorry, could you repeat that again?
8    Q.  Sure.
9      Does Alphabet generate P&L statements,
10  profit and loss statements, with respect to revenues
11  generated by the sales of hardware, including
12  smartphones and tablets?
13    MS. BAILY:  Object to form.
14    THE WITNESS:  So currently, the hardware
15  team maintains financials, which includes revenues
16  from smartphones.
17  BY MS. DOMINGUEZ:
18    Q.  Now, earlier I think you told me about some
19  P&L statements with respect to platforms and
20  ecosystems that you're responsible for; right?
21    A.  Yes.
22    Q.  Okay.  And you told me that that included
23  revenues minus costs to get to an operating profit?
24    A.  Yes.
25    Q.  Are there similar reports on the hardware

Page 55

1  side?
2    A.  Yes.
3    Q.  With respect to the revenue number, how is
4  that determined?  Is there some information that
5  feeds into the finance system with the revenue
6  number?
7    MS. BAILY:  Object to form.
8    THE WITNESS:  Sorry.  Could you maybe
9  reframe the question?
10  BY MS. DOMINGUEZ:
11    Q.  Sure.
12      How is the revenue on the hardware side
13  determined?
14    MS. BAILY:  Object to form.
15    THE WITNESS:  ████████████████
16  BY MS. DOMINGUEZ:
17    Q.  And is there a module of the ██████████
18  that tracks sales such that the revenue is
19  determined?
20    A.  And, again, sales is defined as the
21  quantity of --
22    Q.  How does Alphabet generate revenue on its
23  hardware devices?
24    MS. BAILY:  Object to form.
25    THE WITNESS:  Google generates revenue on

Page 56

1  its own hardware devices by selling them.
2  BY MS. DOMINGUEZ:
3    Q.  All right.  Is there a system that tracks
4  those sales such that that revenue can then feed
5  into the financials, the P&Ls?
6    A.  So there -- so we do have systems and
7  processes that enable us to bill a customer, or it
8  might be a partner, like a carrier, and that
9  information enables us to book revenues.
10    Q.  Okay.  And what is that system, the system
11  that enables you to bill customers or partners that
12  enables you to then book revenues?
13    A.  We have a lot of systems.  So I may need to
14  get back to you.
15    Q.  Okay.  What I'm trying to figure out is, if
16  I want to know what data Alphabet maintains with
17  respect to the sales of its mobile devices, what
18  department or what person would I go to?
19    MS. BAILY:  Object to form.
20    THE WITNESS:  It's something that
21  potentially, in coordination with other teams,
22  finance would be able to provide.
23  BY MS. DOMINGUEZ:
24    Q.  Can you tell me what data Alphabet
25  maintains with respect to the sales of its hardware?

Page 57

1    And by that I mean, whether it tracks
2  purchase orders, quantity, price, the name of the
3  customer or carrier, the cost -- the costs
4  associated with building the hardware or anything
5  else that might be in that database.
6    MS. BAILY:  Object to form.
7    THE WITNESS:  So -- well, I'm in finance,
8  so I can tell you that we do have systems that tell
9  us about the financials associated with the
10  hardware.  When it comes to specific, more detailed
11  metrics, I'm less sure whether there is one system
12  that could generate all this information.
13  BY MS. DOMINGUEZ:
14    Q.  Do you know whether there is more than one
15  system that the data would be spread across?
16    MS. BAILY:  Object to form.
17    THE WITNESS:  It's very likely, but I'm not
18  sure.
19  BY MS. DOMINGUEZ:
20    Q.  And so are you the right person to explain
21  to me the specific details or data that Alphabet
22  tracks with respect to each sale of a hardware
23  device?
24    MS. BAILY:  Object to form.
25    THE WITNESS:  I probably wouldn't be able

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY



Page 150

1  readily available, but I'm not a hundred percent
2  certain.
3  BY MS. DOMINGUEZ:
4      Q.  Do you know who pulled the data that's
5  contained in Exhibit 9?
6      A.  Yes.
7      Q.  Who was that?
8      A.  It's John Yoo.  Or, actually, John -- well,
9  I know he worked on this data.
10     Q.  Okay.  Did you talk about the spreadsheet
11 that's Exhibit 9 with Mr. Yoo in preparation for
12 your deposition?
13     A.  Yes, I did.
14     Q.  What facts did Mr. Yoo give you about
15 Exhibit 9?
16     A.

Page 151

1
11         MS. BAILY:  Object to form; outside the
12 scope.
13

Page 152

2      Q.  Did Mr. Yoo give you any other facts with
3  respect to Exhibit 9, the spreadsheet that's 142178?
4      A.  No, he did not.
5      Q.  Now, we've looked through quite a few
6  spreadsheets, but based on everything that we've
7  gone through, is there a way to determine the
8  specific amount of U.S. revenues, cost of sales,
9  units, and gross profit for each accused product?
10         MS. BAILY:  Object to form.
11         THE WITNESS:  For each individual product?
12 No.
13         (Deposition Exhibit 10 was marked for
14 identification)
15 BY MS. DOMINGUEZ:
16     Q.  All right.  Ms. Richardson, the court
17 reporter has handed you what has been marked as
18 Exhibit 10 to your deposition.
19         Can you identify that document for me,
20 please?
21     A.  Yes.
22     Q.  What is that?
23     A.  This is Google LLC's supplemental responses
24 to Plaintiff's Second Set of Individual
25 Interrogatories (No. 4).

Page 153

1      Q.  And if you look back at Exhibit 3, the last
2  page, that last topic is Google's response to
3  SEVEN's individual and common interrogatories.
4         Do you see that?
5      A.  Yes.
6      Q.  You are Google's corporate representative
7  with respect to Topic 157 on this individual
8  Interrogatory Number 4; is that right?
9      A.  Yes.
10     Q.  If you could turn over to page 6, you'll
11 see at the top of the page Interrogatory Number 4.
12     A.  Mm-hmm.
13     Q.  "From December 13th, 2011 to the present
14     identify Your sales of apps, games, and
15     digital content from Google Play per month,
16     quarter, and year."
17     Do you see that?
18     A.  Yes.
19     Q.  And then the response, we've got a response
20 and a first supplemental response, both of which
21 refer to a number of spreadsheets.
22     Do you see that?
23     A.  Yes.
24     Q.  Okay.  Did you have any involvement in
25 preparing Google's response to Interrogatory Number

# EXHIBIT B